**14 MISC 0 0 2**

EJK:SK
F.#2013R01878

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -X

IN THE MATTER OF THE SEARCH OF:

THE PREMISES KNOWN AND
DESCRIBED AS ELECTRONIC MAIL
ADDRESS "c.cordova519@gmail.com"

TO BE FILED UNDER SEAL

AFFIDAVIT IN
SUPPORT OF A
SEARCH WARRANT

(T. 21, U.S.C., §§ 841(a)(1) and 952(a))

- - - - - - - - - - - - - - - -X
EASTERN DISTRICT OF NEW YORK, SS:

CHRISTOPHER McKELVY, being duly sworn, deposes and states that he is a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"), duly appointed according to law and acting as such.

Upon information and belief, there is probable cause to believe that there is located in THE PREMISES KNOWN AND DESCRIBED AS ELECTRONIC MAIL ADDRESS "c.cordova519@gmail.com" (the "SUBJECT EMAIL PREMISES"), subscriber/profile information, email transmission information, subject headings, to/from information, folders and email content (including all of the foregoing for deleted messages), as described more fully in Attachment B, which constitute evidence, fruits and instrumentalities of importing a controlled substance into the United States from a place outside thereof, in violation of Title 21, United States Code, Section 952(a), and possessing with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI") and have been a Special Agent with HSI for approximately 5 years. I am responsible for conducting and assisting in investigations into the activities of individuals and criminal groups responsible for federal narcotics offenses and narcotics trafficking into the United States. These investigations are conducted both in an undercover and overt capacity. I have participated in investigations involving search warrants and arrest warrants. As a result of my training and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

2. I have personally participated in the investigation of the offenses discussed below. I am familiar with the facts and circumstances of this investigation from my own observations, reports made to me by other law enforcement officers, and review of records from HSI and other government agencies. In addition, when I rely on statements made by others, such statements are set forth only in part and in substance unless otherwise indicated.

3. HSI is investigating the unlawful possession with intent to distribute narcotics and importation of narcotics.

---

[1] Because this affidavit is submitted for the limited purpose of establishing probable cause for a search warrant, I have not set forth each and every fact learned during the course of the investigation.

## BACKGROUND

4. On or about November 6, 2013, Christina Cordova (the "Courier") arrived at John F. Kennedy International Airport ("JFK") aboard Caribbean Airlines Flight No. 520 from Port of Spain, Trinidad.

5. After the Courier's arrival, United States Customs and Border Protection ("CBP") officers selected the Courier for an enforcement examination. The Courier presented a green suitcase and two yellow carry-on bags for inspection (collectively, the "Luggage"). The Courier informed CBP officers, in sum and substance and relevant part, that the Luggage and everything within it belonged to the Courier, that the Courier had purchased all of the items in the Luggage, and that the Courier had packed the Luggage herself.

6. In the Luggage, CBP officers found eight boxes marked as containing Tortuga Caribbean Rum Cakes (the "Boxes"). CBP officers probed the cake inside one of the Boxes and discovered a white powdery substance. The white powdery substance field-tested positive for cocaine. CBP officers also discovered a white powdery substance concealed in each of the other Boxes. Law enforcement officers recovered a total gross weight of approximately 3,675.6 grams of cocaine from the Boxes.

7. The Courier was arrested. The Courier was read her Miranda rights and invoked her right to counsel. Subsequently, the Courier expressed that she wanted to speak to law enforcement officers. The Courier was re-read her Miranda rights; she waived those rights and agreed to speak with law enforcement officers without an attorney present. In post-arrest statements, the Courier stated, in sum and substance and relevant part, that: the Courier wanted to go on vacation and consulted a co-worker in Elizabeth, New Jersey (the "Recruiter") about possible destinations; the Recruiter suggested that the Courier go to

Trinidad and informed the Courier that she (the Recruiter) had a friend in Trinidad (the "Supplier") who could facilitate the Courier's trip; the Courier paid for the trip and her hotel using her credit card; and upon arrival, the Courier met with the Supplier, who picked the Courier up from the airport, took her to the hotel, and took her around shopping and elsewhere. The Courier further stated, in sum and substance and relevant part, that: the Courier bought the Boxes at a store; the Courier packed the Boxes in the Luggage; and the Supplier gave the Courier the number of an individual in New York (the "Pick-Up Guy") who could pick the Courier up once she returned to New York and if she needed a ride home.

8. Subsequently, the Courier stated that she wished to speak with law enforcement officers again. The Courier stated, in sum and substance and relevant part, that: the Recruiter told the Courier that the Courier could earn $3000 for bringing gold into the United States from Trinidad; the Recruiter told the Courier that she (the Recruiter) had taken trips for the Supplier before; the Courier paid for her airplane ticket to Trinidad on Thursday (October 31, 2013, two days prior to departure) with money that the Supplier had sent her via Western Union; the Supplier paid for the Courier's hotel in Trinidad; the Supplier gave the Courier the Boxes on the night before she left Trinidad (the Courier did not buy them); the Supplier told the Courier that the Boxes contained Guyana gold that the Supplier wanted to smuggle into the United States; the Courier asked the Supplier if the Boxes contained drugs and the Supplier responded that they did not contain drugs, just gold; and the Supplier instructed the Courier to call the Pick-Up Guy upon arrival in New York and informed the Courier that the Pick-Up Guy would pick up the Courier and take the Boxes from her.

9. At the time of the enforcement examination, the Courier had a cellular telephone in her possession. A search of the foregoing cellular telephone revealed:

    a. the telephone numbers of the Recruiter, the Supplier, and the Pick-Up Guy among the list of phone contacts;

    b. a photograph of a business card for a hotel in Trinidad containing the hotel's telephone numbers and email address;

    c. two outgoing telephone calls made on the morning of November 6, 2013, shortly after the Courier's arrival at JFK;

    d. a WhatsApp text message conversation dated October 31, 2013, referencing Western Union payment information;

    e. a photograph taken on November 1, 2013, of a WhatsApp text message from the Courier to the Supplier stating "Ok cool";

    f. photographs taken on November 4, 2013, of flight itineraries and airfares for various flights from Port of Spain, Trinidad to JFK departing on November 6-7, 2013;

    g. an unsent outgoing text message to the Pick-Up Guy dated November 6, 2013, stating "Just got off the plane."

  10. At the time of the enforcement examination, the Courier also had in her possession a printout of an email sent to the SUBJECT EMAIL PREMISES on October 31, 2013, containing the Courier's flight information for her trip to Trinidad. The printout indicates that the Courier accessed the SUBJECT EMAIL PREMISES multiple times on November 1, 2013. The printout also indicates that the SUBJECT EMAIL PREMISES contains at least 600 emails including emails related to Personal, Work, Receipts, and Travel information.

11. Based on my investigation, the Recruiter uses the email address tatiannano1@gmail.com, the Supplier uses the email address entryon05@yahoo.com, and the hotel in Trinidad referenced in paragraph 9(b) uses the email address palmshoteltrinidad@gmail.com.

12. On December 2, 2013, a grand jury in the Eastern District of New York returned an indictment charging the Courier with one count of importation of cocaine (in violation of 21 U.S.C. § 952(a)) and one count of possession of cocaine with intent to distribute (in violation of 21 U.S.C. § 841(a)(1)).

13. Based on my training and experience and discussions with other law enforcement officers, I know that individuals involved in the importation and possession with intent to distribute narcotics often do not act alone and often communicate with coconspirators by means of cellular telephones, email, social media, cross platform mobile-messaging applications and the internet.

14. Based on my training and experience, I know that it can take several weeks to months to plan a trip involving the importation of narcotics. Indeed, mobile telephone provider MetroPCS provided HSI with call detail records for the Recruiter's cellular telephone. Review of the foregoing call detail records revealed multiple contacts between the Recruiter and the Courier before and after the Courier's trip to Trinidad. Specifically, the Recruiter and Courier exchanged calls on or about October 12, October 19, October 26, October 31, November 1, and November 7, 2013.

## TECHNICAL BACKGROUND

15. The SUBJECT EMAIL PREMISES is an email account which is hosted by Google (hereinafter, the "email provider"). In my training and experience, I have learned

that the email provider provides a variety of online services, including email access, to the general public. The email provider allows subscribers to obtain email accounts at the domain name gmail.com, such as the email account listed in Attachment A. Subscribers obtain an account by registering with the email provider. During the registration process, the email provider asks subscribers to provide basic personal information. Therefore, the computers of the email provider are likely to contain stored electronic communications and information concerning subscribers and their use of the email provider's services, such as account access information, and account application information.

16. In general, an email that is sent to the email provider's subscriber is stored in the subscriber's "mail box" on the email provider's servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on the email provider's servers indefinitely. Even if the subscriber deletes the message, it may remain in the subscribers "trash" folder or otherwise remain accessible to the subscriber.

17. When the subscriber sends an email, it is initiated at the user's computer, transferred via the Internet to the email provider's servers, and then transmitted to its end destination (the recipient). The email provider often saves a copy of the email sent. Unless the sender of the email specifically deletes the email from the email provider's server, the email can remain on the system indefinitely.

18. A sent or received email typically includes the content of the message, source and destination addresses, the date and time at which the email was sent, and the size and length of the email. If an email user writes a draft message but does not send it, that message may also be saved by the email provider but may not include all of these categories of data.

19. A subscriber of the email provider can also store files, including emails, address books, contact or buddy lists, calendar data, pictures, and other files, on servers maintained and/or owned by the email provider.

20. In general, email providers like Google ask each of their subscribers to provide certain personal identifying information when registering for an email account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).

21. Email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the email provider's website or via email clients such as Microsoft Access), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

22. In some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support

services, as well records of any actions taken by the provider or user as a result of the communications.

23. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, emails in the account, and attachments to emails, including pictures and files.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

24. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require the email provider to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

25. Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that on the computer systems in the control of the email provider there exists evidence of crimes. Accordingly, a search warrant is requested.

26. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that - has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

27. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

28. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations, and not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other criminals as they deem appropriate, e.g., by posting them publicly through online forums. Therefore, premature disclosure of the contents of this affidavit and related documents will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, and notify confederates.

29. Pursuant to 18 U.S.C. § 2705(b) and for the reasons stated above, it is further requested that the Court issue an Order commanding Google not to notify any person (including the subscribers or customers of the account listed in the attached warrant) of the existence of the attached warrant until further order of the Court.

WHEREFORE, your deponent respectfully requests that the requested search warrant be issued for THE PREMISES KNOWN AND DESCRIBED AS ELECTRONIC MAIL ADDRESS "c.cordova519@gmail.com."

IT IS FURTHER REQUESTED that all papers submitted in support of this application, including the application and search warrant, be sealed until further order of the Court.

_____
Christopher McKelvy
Special Agent, HSI

Sworn to before me this
24th day of January, 2014

_____
THE HONORABLE MARILYN D. GO
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

### Property To Be Searched

This warrant applies to information associated with "c.cordova519@gmail.com" that is stored at premises owned, maintained, controlled, or operated by Google, a company that accepts service of legal process at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

## ATTACHMENT B

### Particular Things To Be Seized

I. <u>Information to be disclosed by Google (the "Provider")</u>

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, logs or other information that has been deleted but is still available to the Provider, from the time period of October 1, 2013 to the present, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

    A.    The contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

    B.    All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

    C.    The types of service utilized;

    D.    All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

    E.    All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

II. <u>Information to be seized by the government</u>

Pursuant to Rule 41(f)(1)(B), the government will retain a copy of the electronically stored information that was seized or copied for the purpose of evidentiary authentication and any potential discovery obligations in any related prosecution. All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and 952(a), those violations involving

Christina Cordova and others, and occurring after October 1, 2013, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

> A. The unlawful possession with intent to distribute cocaine and importation of cocaine.
>
> B. Records relating to who created, used, or communicated with the account or identifier, including records about their identities and whereabouts.